**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation, Plaintiff and Appellant,**

v.

**Richard D. WEE and St. Paul Fire and Marine Insurance Company, a corporation, Defendants and Respondents.**

Civ. No. 8661.

Supreme Court of North Dakota.

June 22, 1971.

Wattam, Vogel, Vogel & Peterson, Fargo, for plaintiff and appellant.

Funke & Eaton, Minot, for Richard D. Wee, defendant and respondent.

Zuger, Bucklin, Kelsch & Zuger, Bismarck, for St. Paul Fire and Marine Ins. Co., defendant and respondent.

TEIGEN, Justice.

The plaintiff, State Farm Mutual Automobile Insurance Company (hereinafter referred to as the insurer), has appealed from the adverse part of a summary judgment which dismisses its claim against the defendant, St. Paul Fire and Marine Insurance Company (hereinafter referred to as St. Paul).

The defendant, Richard D. Wee, was insured by the insurer under the provisions of an automobile insurance policy. Coverage C of Insuring Agreement I of the policy provided that the insurer would pay any reasonable medical expenses incurred by Mr. Wee (hereinafter referred to as the insured) within one year from the date of any accident in which the coverage was extended. The insured was involved in an automobile accident and, as a result, incurred injuries which necessitated medical treatment. The insurer advanced to its insured $736.05 to cover his medical bills. The advance was evidenced by the following loan receipt:

"LOAN RECEIPT UNDER MEDICAL PAYMENTS COVERAGE

"POLICY NO. 467–573–34 D  CLAIM NO. 34–072–775

"(Dated at) Minot, N.D. 2–24 1969

"The undersigned hereby acknowledges receipt from the State Farm Mutual

Automobile Ins. Company of the sum of $736.05 as a loan without interest under Policy No. 467–573–34 D repayable only in the event and to the extent that any net recovery is made by the undersigned from any person or persons, corporation or corporations, or other parties, on account of personal injuries sustained in an accident which occurred on or about the 1st day of March, 1968, at or near Minot, North Dakota and the undersigned hereby agree, if reasonable cause therefore exists, to make claim, and if necessary enter into and prosecute action against such person, corporations or parties through whose negligence the aforesaid expenses were incurred, or who may otherwise be responsible therefore with all diligence, in the undersigned's own name, and to act with respect to any such recovery as a trustee of the State Farm Mutual Automobile Ins. Company with respect to any such funds recovered to the extent of payment made hereon."

Condition 4 of the policy provides that to the extent that the insurer made any payment to the insured under medical coverage provisions of the policy, the insurer was to be subrogated to the proceeds of any settlement or judgment that the insured might obtain against the person responsible for the injuries.

Subsequently, the insured commenced action against the alleged wrongdoer, who was insured by St. Paul, and St. Paul settled the insured's claim for personal injury for $4,500. It is agreed that this settlement included the full amount of the insurer's advances for medical expenses. Prior to the settlement, St. Paul had been notified by the insurer that it was claiming subrogation in the amount of $736.05 under the medical coverage provision of the policy. St. Paul advised the insurer that it would not honor the insurer's claim to subrogation rights until the courts of this state had ruled on the legality of its claimed right of subrogation under the policy with reference to medical payments made on behalf of its insured. Apparently the insured took no steps to se-

cure a ruling and, consequently, St. Paul paid the settlement in full to the insured and took his receipt in full settlement of all claims. The insured refused to reimburse his insurer, whereupon this action was commenced by the insurer against its insured and St. Paul. The trial court granted summary judgment in favor of the insurer and against its insured. No appeal has been taken from that part of the summary judgment. The trial court dismissed the action against St. Paul and the insurer has appealed from the adverse decision.

The trial court concluded that the medical subrogation provision appearing in Condition 4 of the policy is valid and enforceable; that the insured was obligated, under the terms of the subrogation provision and under the terms of the loan receipt, to reimburse the insurer in the amount of $736.05, which had been advanced by the insurer to pay the insured's medical expenses. It also held that when the insured made a release of all claims he was acting as trustee for the insurer with respect to any amounts recovered up to the sum of $736.05, in accordance with the provisions of the trust agreement contained in the loan receipt; that the medical payment provision of the insured's policy did not operate to impress a lien in the insurer's favor to the extent of its payments upon the settlement proceeds; that St. Paul dealt with the insured as trustee of the insurer with respect to any amounts paid in settlement of the medical expenses incurred by the insured; and that St. Paul owed no duty to the insurer to insure that it would be reimbursed.

We are concerned in this appeal with that part of the summary judgment which dismisses the insurer's claim against St. Paul.

The insurance policy makes no provision for a loan in lieu of payment. It provides that payment shall be made under its medical coverage provision. Coverage C contracts, "To pay reasonable medical expenses incurred within one year from the date of accident * * *" within limits of $1,000 for each person. The policy also provides

that "Upon payment under coverage C * * of this policy the company shall be subrogated to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery which the injured person or anyone receiving such payment may have * * *" For some reason unexplained, the insurer elected, in this instance, to make a loan instead of a payment as required under the terms of the policy. The insured, also for some reason unexplained, elected to accept the loan in lieu of payment.

In its complaint the insurer alleges that the insured executed the loan receipt, and attached a copy thereof as an exhibit. It alleges that St. Paul neglected and refused to honor its subrogation claim in violation of the terms of the policy and the loan receipt. In its answer St. Paul admits the execution of the loan receipt and alleges that instead of making direct payments to discharge any rights between the insurer and the insured, the insurer made a loan and appointed the insured to make claim and to act as a trustee of the insurer with respect to any funds recovered as a result of the injuries. St. Paul dealt with the insured as a person in charge of and authorized to prosecute any claims against the responsible persons and, upon settlement, the insured made a release of all claims and received the money therefor as trustee of the insurer and, as such, was authorized to execute a general release of all claims.

■ We have not been advised of the reason why the insurer elected to take a loan receipt in this case. If we were to speculate, we might assume that a loan receipt was taken because this state has not yet decided the question of whether an insurer is subrogated to medical payments under the subrogation provision of this policy. It appears that this question has been settled in a variety of ways in other states. 19 A.L.R.3d 1054. It appears, however, we will not reach this question in this case because the insurer elected to make a loan arrangement instead of following the ordinary course of making payment and taking a loss receipt. The first question we must decide is whether the transaction in this instance was a loan or a payment. If it is held to be a loan, the insurer is not subrogated either on equitable principles or by the subrogation provision contained in the policy. Volume 16, Couch on Insurance 2d, Sec. 61:82; 44 Am.Jur.2d Insurance, Sec. 1824; 13 A.L.R. 3d 42.

The insurer, in its argument that the loan receipt entitles it to be subrogated to the claims of its insured to the extent of the loan, relies principally upon Calvert Fire Insurance Co. v. James, 236 S.C. 431, 114 S.E.2d 832, 92 A.L.R.2d 97 (1960), as the "one case" it could find where the court had to decide whether the execution of a "loan receipt" releases the wrongdoer from his obligation, after notice, to protect the subrogation rights of the injured party's insurer. We commend the insurer's attorneys for the depth of their research. However, we find that this case is not applicable. The insurer relies upon the South Carolina decision as published in 114 S.E.2d 832, which decision terms the instrument in question as a "loan receipt." We have examined the text of the opinion as contained in the official South Carolina Reports (236 S.C. 431, 434) and it terms the instrument in question as "the usual 'loss receipt' ". The attorneys for the insurer have pointed out that this opinion is the lead case in 92 A.L.R.2d 97, which opinion also terms the instrument as a "loss receipt", but they assumed that this was a printing error. We accept the term "loss receipt" as the correct characterization of the instrument referred to in that case, as published in the official South Carolina Reports, and conclude that the supreme court, in that case, had before it a loss receipt and not a loan receipt.■

This is a case of first impression in this state and we have found no cases deciding the precise issue, nor have any been pointed out to us.

Couch on Insurance 2d has analyzed a loan receipt transaction as it affects subrogation, as follows:

"A 'loan receipt' is an arrangement under which the insurer advances to the insured the amount of loss to the extent of the insurer's liability, which loan is repayable only in the event and to the extent of any net recovery by insured.

"The loan receipt transaction permits an insurer to make speedy payment to an insured, and yet avoid the consequence of subrogation that the insurer is the real party in interest which must prosecute the claim against the tortfeasor in its own name." Couch on Insurance 2d, Vol. 16, Sec. 61:72.

"The insurer is bound by the terms of the loan receipt agreement. Consequently, an insurer who has advanced a part of the loss to the insured as a loan to be repaid only out of any recovery against the person who caused the loss, under an agreement requiring the insured to prosecute his claim against such person and, if necessary, to institute suit, of which the insurer shall have exclusive direction and control, will not be heard to say that the insured did not have the legal right to prosecute such an action or that insurer is not bound by the result thereof." Couch on Insurance 2d, Vol. 16, Sec. 61:74.

"A 'loan receipt' arrangement under which the insurer advances to the insured the amount of loss to the extent of the insurer's liability, such loan being repayable only in the event and to the extent of any net recovery by insured, is a lawful arrangement." Couch on Insurance 2d, Vol. 16, Sec. 61:76.

"When the loan receipt transaction is held merely a loan, it follows that no 'payment' has been made and therefore no subrogation arises, that is, no right of subrogation is created by a loan to the insured by his insurer, repayable out of any net recovery on account of the loss of the property insured, since such a loan is not considered as payment, and therefore the insurer making such loan is not entitled to subrogation." Couch on Insurance 2d, Vol. 16, Sec. 61:82.

"Some jurisdictions have refused to give effect to a loan receipt according to its terms, and have held that the transaction constituted a payment by which the insurer was subrogated to the claim of the insured.

"By this view, the intention of the parties that the transaction be a loan and not a payment is immaterial." Couch on Insurance, Vol. 16, Sec. 61:87.

American Jurisprudence 2d on Insurance makes the following analysis on subrogation as affected by loan receipt transactions:

"Agreements or transactions usually called 'loan receipts' are often entered into between an insured and an insurer for a loan repayable to the extent of recovery from other insurance, as well as from a carrier or other person causing loss. The insurer's purposes in making a loan rather than a payment are to avoid subrogation and thus to permit the insurer to avoid becoming a formal party to an action against a tortfeasor or other person liable for the loss or damage, to eliminate any contention that a void insurance policy is valid, and to avoid giving carriers and others the benefit of contractual provisions stipulating that their liability shall be reduced by the amount of any payment collected from others. Such agreements or transactions have generally been held valid and, subject to some authority regarding them as legal payment, they have been held to constitute loans, particularly where the insurer's liability was in any way contingent, as where its liability was contingent upon nonliability of a carrier, or limited to a prorata portion of the loss

or to excess insurance, or contingent upon the nonexistence of other insurance, although in a number of cases a loan receipt transaction has been held to constitute a valid loan even though the insurer's liability was absolute.

"The primary effect of a loan receipt is to keep alive a third person's liability to the insured for the loss and to permit an action against such third person to be prosecuted in the insured's name, because where the transaction is deemed a valid loan and not a payment of the insurer's liability to its insured, the insurer is not subrogated to the insured's rights against third persons, subrogation to such rights taking place only where the transaction is regarded as a subterfuge and the payment thereunder held to constitute a discharge of the insurer's liability. Moreover, a loan receipt has been held not to constitute an assignment to the insurer of the insured's cause of action against a third person. Furthermore, a loan receipt transaction regarded as a true loan has consistently been held not to inure to the benefit of a third person legally liable for the loss, whether such third person was a tortfeasor, a carrier, a bailee, or another insurer, except that an insured has been held bound by a settlement made by his insurer with a tortfeasor, where it was made pursuant to a provision in the loan receipt authorizing the insurer to settle in the insured's name with the tortfeasor. On the other hand, a loan receipt has been held not to insulate the insurer from defenses that may be asserted against the insured, or to effectively assign to the insurer rights which the insured does not possess." 44 Am.Jur.2d Insurance, Sec. 1824. See also Sections 1845 and 1855.

According to the background summary of the Annotation, Insurance—Loan Receipts, 13 A.L.R.3d 42, it appears that loan receipt transactions have uniformly been held to constitute loans in all cases where the insurer's liability was in any way contingent. However, it appears there is a divergence of opinion where the insurer's liability is absolute, as in this case, but that, in most such cases, the transaction was held to be a loan and not a payment. We have examined the cases cited in the Annotation in which the loan transaction was held to constitute payment and find that none are applicable here. These cases are based on various theories that evolved because of the circumstances in each particular case. Generally, the cases which hold that a loan receipt constituted payment are premised on the basis that the arrangement was regarded as a mere subterfuge, and the decisions have been against the contention made by the insurer. As we stated earlier, no explanation has been given why the insurer took a loan receipt in this case. We find that it placed a burden on its insured to prosecute the action and that it has refused to allow any deduction from the amount claimed for attorney's fees, which were expended incident to the recovery of the funds by its insured. In its efforts to obtain repayment from its insured, the insurer has relied on the theory that the advances constituted a loan and not a payment. However, as against St. Paul, the insurer claims that it is subrogated to the rights of its insured and seeks reimbursement from St. Paul on the basis that it was subrogated and that St. Paul failed to protect its rights under the subrogation claim. We see no justice or equity in the insurer's claim.

The insurer did not make payment of the medical expenses as required by its policy. Therefore it is not entitled to conventional subrogation because the terms of the policy provide that "upon *payment* under coverage C" (medical expenses) the insurer shall be subrogated. In seeking recovery from its insured it has relied on the loan receipt, but in its claim against St. Paul it alleges that it is subrogated to the rights of its insured. Under the circumstances, we find that the insurer has waived conventional subrogation. Equitable subrogation is founded upon principles of equity and justice, intended to afford

protection of the rights of a creditor. It is based on the theory that the one invoking it has rightfully discharged debt at the instance and for the benefit of the debtor and that he may be substituted as creditor. The doctrine of subrogation will be applied only in equitable discretion. Baker v. Fargo Bldg. & Loan Ass'n, 64 N.D. 317, 252 N.W. 42; First Nat. Bank v. Plante, 60 N.D. 512, 235 N.W. 135; Nelson v. Nelson, 58 N.D. 134, 226 N.W. 476; Heegaard v. Kopka, 55 N.D. 77, 212 N.W. 440. Clearly, this case is not one for the application of such a principle against St. Paul. When the insurer made a loan to its insured instead of the payments called for by the policy, took a loan receipt instead of a loss receipt, and constituted its insured as its agent with power to act with respect to any recovery as a trustee, the insurer took the risk that its insured would comply with the provisions of the loan receipt and relied thereon. In its notice to St. Paul, the insurer made no claim that its insured and trustee would misapply, or intended to misapply, the money. We find that the notices do not comport with the requirement of the rule cited by the insurer and set forth in Restatement of the Law 2d, Trusts 2d, Sec. 321, which is as follows:

> "If a third person pays or conveys to the trustee money or other property which the trustee as such is authorized to receive, and the trustee misapplies the money or other property, the third person is liable for participation in the breach of trust, if, but only if, when he made such payment or conveyance he had notice that the trustee was misapplying or intending to misapply the money or other property."

In fact, at the time the notices were sent, St. Paul was not notified that a loan receipt had been taken. At that time the insurer was seeking to enforce subrogation for medical coverage payments and the issue which arose was whether medical coverage payments could be subrogated under North Dakota law.

 We hold that, under the circumstances of this case, the insurer's advances to its insured for medical payments constituted a loan and not a payment; that the insurer was not subrogated to the rights of its insured under the doctrine of conventional subrogation or equitable subrogation; that the insured, as trustee for the insurer, was authorized upon settlement to execute and deliver a release of all claims; and that neither the loan receipt nor the subrogation clause of the policy operated to impress a lien in favor of the insurer, to the extent of its payments, upon the settlement proceeds while in the possession of St. Paul and that, therefore, St. Paul owed no duty to the insurer that it would be reimbursed.

The summary judgment is affirmed.

STRUTZ, C. J., and ERICKSTAD, PAULSON and KNUDSON, JJ., concur.